IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:06cr144-WKW |
| | ) | |
| PAUL MEREZ GRAHAM | ) | |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

Defendant filed a motion to suppress (Doc. # 18) on August 10, 2006, and filed an addendum to the motion (Doc. # 30) on September 12, 2006. The United States filed its response to the motions (Doc. # 35) on September 22, 2006. The undersigned held a hearing on the motion to suppress and addendum on June 15, 2007. For the reasons set out below, the motion to suppress and addendum are due to be denied.

**Facts**

On January 10, 2006, at approximately 4 p.m., an anonymous female called detective J.T. Conway, an investigator at the Montgomery Police Department, with a tip concerning an imminent drug transaction. Specifically, the caller notified Conway that a black male named Paul Graham would be en route in a small red rental car to the Pizza Hut on Coliseum Boulevard in Montgomery "in just a little while" to meet with some men in an older model Cadillac and deliver some cocaine. Corporal Conway gave the caller, who would not provide her name or telephone number, his own cell phone number and asked her to call him back if she received any more information.

Conway proceeded to run a check of the police department's narcotics database, and

found Paul Graham's name in the system. After meeting with other officers, he and Captain Robert Hughes drove to the Pizza Hut and parked near it (some 50-75 yards away) in the parking lot of a strip mall to wait to see whether the red car and the Cadillac showed up. Several other officers also drove to the area, most of them in unmarked cars.

After Conway and Hughes set up surveillance at the Pizza Hut, the anonymous caller telephoned Conway again to say that "Paul would be showing up in a few minutes, he's on his way." About five to ten minutes later, a small red car pulled into the parking lot of the Pizza Hut.[1] There were two black males in the car. The red car drove slowly around the parking lot, circling the building and finally parking at the rear of the Pizza Hut, despite the fact that there were only a few cars in the lot and many spaces available. The car remained in the parking space for a few minutes, then backed out and circled the Pizza Hut slowly once again, and returned and parked in the same parking space at the rear of the building. According to the officers, no-one got out of the car.

Conway and Hughes thought that the behavior of the occupants of the red car was suspicious, and were concerned that the men might be casing the business for a robbery even if they were not there for a drug transaction. Conway told the other officers by radio that he and Hughes were going to approach the car to "see who they are and what's going on." Conway pulled his unmarked car beside defendant's car, with the passenger's side of his vehicle next to the driver's side of the red car. Conway was driving a Lincoln Navigator,

---

[1] No Cadillac ever arrived at the Pizza Hut. The officers did see a Cadillac on Coliseum Boulevard, but it drove into a B.P. station and "it appeared they were only getting gas."

which rode higher up than the red car, and Hughes could see into the driver's side of defendant's car. As soon as he opened his door and started to get out of the car, Hughes observed a gun between the center console and the driver's right leg. He immediately yelled, "Gun!" to the other officers. Hughes drew his own weapon and opened the door of the red car, made defendant Graham get out, and secured the handgun. When Conway removed the passenger from the other side of the car, he saw an unzipped and open black briefcase or satchel in plain view on the floorboard on the passenger's side with four one-gallon Ziploc bags of marijuana inside.

    As the officers took Graham out of the car, he made the statement that everything in the car was his and that the other man in the car was a friend of his that he had just picked up. The officers started to read Graham his <u>Miranda</u> rights in the parking lot, but decided to take him back to their headquarters first so that, if the Cadillac showed up, its occupants would not see the officers arresting Graham. Back at the Highland Avenue office, during an inventory search of the red car, Sergeant Mercado found 83 grams of cocaine in the center console. Hughes read Graham his rights, with Sergeant Mercado as a witness. Graham told the officers that he wanted to cooperate and told them where the cocaine and marijuana came from. After an interview of about an hour, Hughes released defendant Graham, and they agreed to meet again the next day. However, Graham called Hughes later that night and told Hughes that he had decided not to cooperate.

    Later, a grand jury returned a three-count indictment against Graham, charging him with possession with intent to distribute cocaine and marijuana, possession of a firearm during

a drug trafficking offense, and being a felon in possession of a firearm. When the Marshals Service served an arrest warrant on Graham pursuant to the indictment at a motel in Montgomery on July 14, 2006, they found Graham in possession of $12,343 in United States currency, approximately 3,434 grams of marijuana, four grams of crack cocaine, 70 Ecstacy tablets, 20 Xanax tablets, and a Ruger 9mm handgun. On August 15, 2006, a grand jury returned a superceding indictment, and on February 22, 2007, it returned a second superceding indictment, charging Graham with possession with intent to distribute cocaine powder; using and carrying an Israeli Military Industries Uzi (40 caliber) during drug trafficking; being a felon in possession of an Uzi; possession with intent to distribute marijuana, Ecstasy, cocaine powder, crack cocaine, generic Vicodin, and generic Xanax; carrying a 9mm Ruger during a drug trafficking offense; and being a felon in possession of a 9 mm Ruger.

**Discussion**

1. Vehicle search

Defendant contends in his motion that the warrantless search of the red rental car on January 10, 2006 violated the Fourth Amendment. The court cannot agree.

During the January 10, 2006, incident, police officers went to the Pizza Hut to investigate reported drug activity near the restaurant, acting on a detailed anonymous tip. There, they found defendant in a vehicle that generally matched the description of the red rental car previously reported. No traffic stop or investigative detention had occurred at the time that officers approached the parked vehicle. Thus, even assuming arguendo that officers lacked "reasonable suspicion" under Terry v. Ohio, 392 U.S. 1 (1968), that criminal activity

was afoot, the officers were clearly entitled to approach the defendant and speak to him. See Florida v. Bostick, 501 U.S. 429, 434 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions."); Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006) ("This Court has decided on several occasions that a police officer does not seize an individual merely by approaching a person in a parked car.") (citing United States v. Baker, 290 F.3d 1276, 1277 (11th Cir.2002) (officer approached vehicle stopped in traffic), United States v. De La Rosa, 922 F.2d 675, 677 (11th Cir. 1991) (officer approached individual as he walked away from a parked car); United States v. Thompson, 712 F.2d 1356, 1358 (11th Cir. 1983) (officer approached individual sitting in parked car.)); United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006) ("'Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.'" (quoting United States v. Drayton, 536 U.S. 194, 200-01 (2002)); United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) ("'[N]ot every encounter between a police officer and a citizen is an intrusion requiring an objective justification.'") (citing United States v. Mendenhall, 446 U.S. 544 (1980)(opinion of Stewart J.)).

Thereafter, the officers' concerns about criminal activity clearly ripened into reasonable suspicion. See Miller v. Harget, 458 F.3d 1251, 1259 (11th Cir.2006) ("A detention is reasonable under the Fourth Amendment if 'the officer's action is supported by reasonable suspicion to believe criminal activity "'may be afoot.'"") (citation omitted). When they

5

parked next to the red car, the officers had a particularized and objective basis for suspecting legal wrongdoing based on the following: (1) the detailed and contemporaneous anonymous tip, which was followed by a second anonymous call with updated information;[2] (2) the appearance of Graham's name in a police database relating to drug activity; (3) the arrival at the Pizza Hut of a red car driven by a black male at approximately the time specified by the tipster; (4) the fact that the occupants of the vehicle did not go into the Pizza Hut and, instead, circled the parking lot slowly twice as though they were looking for someone, both times parking in the rear despite the empty parking places closer to the main entrances of the building;[3] and, finally, (5) the appearance of an un-holstered handgun within reach of the driver of the red car.  See id. ("To determine if an officer had reasonable suspicion, courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing....Officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (citations and internal quotation marks omitted).

Further, once the officers approached the vehicle to question the occupants, Hughes

---

[2] Anonymous tips corroborated by independent police work can be reliable enough to provide reasonable suspicion to make investigatory Terry stops.  United States v. Gibson, 64 F.3d 617, 620 (11th Cir. 1995); see also United States v. Roper, 702 F.2d 984, 989 (11th Cir. 1983).

[3] Defendant Graham testified that his passenger actually ordered a pizza at the drive-through, and he parked behind the building to wait for the pizza.  However, the court credits the account provided by the officers.

was entitled to secure the weapon that he saw in plain view in defendant's car. There is "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 26; see also United States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004) ("The Supreme Court has stated that officers may take reasonable steps to ensure their safety so long as they possess 'an articulable and objectively reasonable belief that the suspect is potentially dangerous.'"); United States. v. Gibson, 64 F.3d 617, 623-24 (11th Cir. 1995) (A law enforcement officer, during the course of an investigatory stop, may conduct a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual.); Roper, 702 F.2d at 987 (11th Cir. 1983) ("To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of Terry v. Ohio ...."). Under the circumstances of this case, where police reasonably believed that a drug transaction or business robbery was about to occur, the court finds that Hughes was reasonably warranted in the belief that his safety or that of others was in danger.

Once the officers saw the marijuana in plain view in the passenger's side floorboard, they were justified in seizing the contraband. "'The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized

7

object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006). Here, the plain view exception is clearly satisfied.[4] See Colorado v. Bannister, 449 U.S. 1, 4 (1980)(Officer had probable cause to seize incriminating items visible on the floorboard of a vehicle without a warrant.); United States v. Lang, 81 F.3d 955, 968 (10th Cir.1996) (Cocaine visible on the floorboard of a vehicle fell within the plain view exception to the warrant requirement.).

Further, Sergeant Mercado's seizure of the cocaine from the red vehicle did not occur until after defendant had been arrested and transported to police headquarters. Thus, this seizure was lawfully made incident to an arrest. See United States v. Goddard, 312 F.3d 1360, 1364 (11th Cir. 2002) ("Since the custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment, a search incident to the arrest requires no additional justification.... In fact, a full search incident to a lawful arrest is *not only* a 'reasonable' search under the Fourth Amendment, it is *also* an exception to the warrant requirement.)(citations omitted)(emphasis in original). Accordingly, the evidence seized by police from the red rental car is not due to be suppressed.

2. Miranda warnings

There is no dispute in this case that defendant's initial statement that everything in the car was his was given to police prior to any Miranda warning. However, this statement is not

---

[4] The defendant testified that the bag containing the marijuana was not unzipped and open. Again, the court credits the contrary testimony of the arresting officers.

8

subject to exclusion. Police are not generally required to give <u>Miranda</u> warnings during ordinary <u>Terry</u> stops. <u>See</u> <u>Pennsylvania v. Bruder</u>, 488 U.S. 9, 10 (1988) (Persons temporarily detained pursuant to such stops are not "in custody" for the purposes of <u>Miranda</u>.). Further, to the extent that defendant had been placed in custody before making the statement at issue, it is clear that police did not actively question the defendant to elicit his statement. "Voluntary and spontaneous comments by an accused, even after <u>Miranda</u> rights are asserted, are admissible evidence if the comments were not made in response to government questioning." <u>Cannady v. Dugger</u>, 931 F.2d 752, 754 (11th Cir.1991); <u>see also</u> <u>United States v. Johnson</u>, 136 Fed.Appx. 279, 283 (11th Cir. 2005). Absent evidence that defendant's statement was the product of interrogation, the statement may not be suppressed. <u>See</u> <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977) ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. ... Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.").

Defendant contends that the statements he made to law enforcement at police headquarters were taken in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). He denies that he was advised of his rights prior to his interview, and he contends that "officers of the Montgomery police department and Graham agreed that he could help himself work off or work down charges in exchange for his providing information and assistance." Motion at 2.

"Before the government may introduce a suspect's uncounselled statement made during custodial interrogation, it must show that the suspect made a voluntary, knowing and

intelligent waiver of his privilege against self-incrimination and his right to counsel. ... This showing has two distinct dimensions: (1) relinquishment of the right must have been the product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) waiver must have been made with the awareness of both the right being abandoned and the consequences of the decision to abandon that right. Courts will look at the totality of the circumstances to determine whether the government has met its burden." United States v. Beale, 921 F.2d 1412, 1434-35 (11th Cir. 1991) (citation omitted).  In this case, Conway testified that he advised defendant of his rights before interviewing him at the jail, and that defendant appeared to be listening, to understand his rights, and to waive them voluntarily.[5] Conway did not use force or threats of violence, or promise Graham leniency in order to persuade him to make a statement; indeed, defendant appeared eager to cooperate.  At most, as Conway testified, the understanding was that if Graham cooperated and provided information, it certainly would not hurt him, and might even help him. As Conway said, "I told him if he cooperated whatever he did would benefit him."[6]

---

[5] Defendant testified that police did not read him his rights.  Again, the court credits the officers' account of what occurred.

[6] Defendant does not argue – and the court declines to find – that this case is comparable to those in which officers told defendants that honesty would not hurt them, in contradiction to the Miranda warning that anything they said could be used against them in court.  See Hart v. Attorney General of State of Florida, 323 F.3d 884, 894 (11th Cir. 2003); United States v. Beale, 921 F.2d 1412 (11th Cir.1991). In this case, the court is persuaded that Graham did not construe the suggestion that if he cooperated and provided information, it certainly would not hurt him, and might even help him, as an assurance that he would not be prosecuted if he confessed, or that his statements would not be used against him.  Instead, considering the totality of the circumstances, the court finds that the gist of what Conway communicated to Graham was simply that he could benefit by cooperating. See United States v. Chealy, 185 Fed.Appx. 928,

---

932 n. 23, 2006 WL 2034749, **2 (11th Cir. 2006) ("'A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and *would probably be helpful to him* is not a sufficient inducement so as to render a subsequent incriminating statement involuntary.'") (quoting United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir.1985) (emphasis added); United States v. Sweetenburg, 186 Fed.Appx. 879, 883, 2006 WL 1736826,**2 (11th Cir. 2006)((Agents' suggestion that if defendant helped law enforcement, his statements would be used only for his benefit did not render defendant's statement involuntary under the totality of the circumstances.).

> The relevant colloquy proceeded as follows:
>
> Q.   [By defendant's attorney.] And you talked with him about cooperating, correct?
> A.   [By Conway.]  Correct.
> Q.   Would it be correct that the goal of his cooperating would be that he could work off or work down a charge, is that correct?
> A.   I don't think we actually discussed anything as to what he [would receive] or anything like that.  We just at that point, he just wanted to cooperate.  He wanted to do something to help his self out.
> Q.   You can't tell what's going to happen until you know what they can and will do, correct?
> A.   That's true.
> Q.   But is it fair to say that the understanding was that if he cooperated and if he provided information it certainly wouldn't hurt him, would it?
> A.   That's correct.
> Q.   It might even help him, correct?
> A.   That's correct.
> Q.   That was clear, was it not?  Although the end result was not exactly clear, correct?
> A.   It was clear that [if] he cooperated, that his assistance would benefit him.
> Q.   And his statements to you were in that context, correct?
> A.   His statements to me?
> Q.   Right.  At your office on Highland Avenue.  When you were talking with him, that's what you were talking about, you were talking about him cooperating, correct?
> A.   Actually we were talking about who he got the cocaine and marijuana from.
> Q.   I know that, but that was part of the cooperation, was it not?
> A.   Correct.  He wanted to know what would happen if he cooperated and I was like, you know, I told him if he cooperated whatever he did would benefit him.

11

Here, the court concludes that Graham's relinquishment of his right against self-incrimination was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and that the waiver was made with the awareness of both the right being abandoned and the consequences of the decision to abandon that right. This is not one of those rare cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda. See Dickerson v. U.S., 530 U.S. 428, 444 (2000).

Because the court finds that the initial seizures and statements in this case were lawful, it also concludes that the subsequent seizures in defendant's motel room are not due to be suppressed as the "fruit of the poisonous tree." Wong Sun v. U.S., 371 U.S. 471 (1963).

## Conclusion

For the foregoing reasons, it is the Recommendation of the Magistrate Judge that the motion to suppress and addendum be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before close of business July 23, 2006. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.

---

Later, this exchange occurred between the AUSA and the defendant:

> Q.     [By the AUSA.]  And when you went back to the station, didn't you tell officer Conway that you wanted to cooperate to try to help yourself out?
> A.     [By Graham.]  He told me that it would be a good idea if I cooperated and helped myself or I was going to take the rap for somebody else.

Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 9th day of July, 2007.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE